UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **COLLEEN KENNEDY and DAVID FOSTER,**       **Plaintiffs,**    v. **SAMSUNG ELECS. AM., INC.,**       **Defendant.** | Civ. No. 2:14-4987 **OPINION** |
| **MITCHELL ORENSTEIN,**       **Plaintiff,**    v. **SAMSUNG ELECS. AM., INC.,**       **Defendant.** | Civ. No. 2:15-4054 |

**WILLIAM J. MARTINI, U.S.D.J.:**

Plaintiffs Colleen Kennedy and David Foster ("Kennedy") and Mitchell Orenstein ("Orenstein"), represented by the same attorney (Mr. Bruce Nagel) in these putative class actions, filed suit against Samsung Electronics America, Inc. ("SEA"), alleging certain top-load washing machine models contained a drain pump design defect that could cause personal injury and property damage. Plaintiffs assert causes of action under state consumer fraud law as well as federal and state warranty and breach of contract claims. These matters come before the Court on Plaintiffs' motion to enforce settlement. There was no oral argument. Fed. R. Civ. P. 78(b). For the reasons below, Plaintiffs' motion should be **GRANTED**.

**I.     BACKGROUND**

On August 7, 2014, Mr. Nagel filed the *Kennedy* class action complaint, alleging certain SEA top-load washers contained a defective flimsy plastic housing covering the drain pump which would break and cause flooding in homes. *Kennedy* Compl. ¶ 25, ECF No. 1.[1] On June 15, 2015, Mr. Nagel filed the *Orenstein* class action complaint, which, like in

---

[1] Unless otherwise indicated, the ECF citations in this Opinion are from the *Kennedy* action.

*Kennedy*, alleged the same drain dump design defects. *Orenstein* Compl. ¶ 25, ECF No. 1. In both cases, Mr. Philip Oliss, admitted *pro hac vice*, represents SEA.

Separate and apart from the *Kennedy/Orenstein* actions, and in what became part of a Multidistrict Litigation matter in the Western District of Oklahoma, multiple plaintiffs filed class-action Complaints in separate federal districts as to SEA's top-load washing machine models. Involving overlapping putative nationwide classes and/or multiple state classes, those Complaints alleged certain SEA top-load washers contained defects that arose during the spin cycle and posed a risk of harm to consumers and their property. Among the claimed defects was that during the washers' spin cycle, components such as the drain pump detach, break apart, or explode. *See In re: Samsung Top-Load Washing Machine Marketing, Sales Practices and Products Liability Litigation*, Case 5:17-ml-2792-D, ECF No. 1 ("MDL Transfer Order") [hereinafter "the MDL Docket"].

On June 20, 2017, before the Judicial Panel on Multidistrict Litigation (the "Panel"), SEA and other retail defendants filed a motion to centralize 24 putative class actions over its top-load washing machines in the Western District of Oklahoma ("the MDL"). Although not listed on the motion papers, Mr. Oliss was and remains SEA's counsel of record in the MDL. On June 13, the Mediator, Judge Stephen Orlofsky (ret.) ("Mediator" or "Judge Orlofsky"), advised this Court that the *Kennedy* and *Orenstein* matters had finally settled.

On August 15, 2017, while the MDL consolidation motion remained pending, this Court held a hearing to inquire as to the absence of settlement documents. ECF No. 44. Plaintiffs' counsel (Mr. Nagel) and SEA's counsel (Mr. Mark Dosker, also from the same firm as Mr. Oliss) reiterated to this Court that two months earlier (June 13, 2017) the parties had reached a settlement on the last material term, namely Plaintiffs' attorneys' fees. *See* Cert. of Bruce H. Nagel, Ex. 1, Aug. 15, 2017, Hr'g Tr. 3:9–4:5, ECF No. 65-3 ("Nagel Cert."). Mr. Dosker attributed the delay to SEA's business requirement to obtain the go-ahead from multiple people within the company but expected final approval by week's end. *Id.* at 4:6–5:15. Having yet to receive draft settlement papers more than two months after agreeing on material terms, the Court ordered SEA to provide Plaintiffs' counsel the settlement documents by September 1, 2017. *See id.* at 10:13.

On August 28, 2017, Mr. Oliss emailed Mr. Nagel draft settlement documents. *See* Cert. of Philip M. Oliss, Esq., Exs. 1(a)–(g), ECF No. 66-1 ("Oliss Cert."). While Messrs. Oliss and Nagel hashed out the written settlement agreement, the Panel acted on SEA's motion by directing the consolidation and transfer of 24 cases, including a drain pump case, to the Western District of Oklahoma ("MDL Court"). *See* MDL Transfer Order. In its October 4, 2017, Transfer Order, the Panel noted the substantial overlap in putative nationwide and statewide classes and common complex factual questions presented. *Id.*

Six days later, on October 10, 2017, Ms. Randee Matloff (Nagel's co-counsel), emailed SEA attorneys, Messrs. Oliss and Dosker, to inquire of them about the recently issued MDL Transfer Order in the "exploding washer case" and that an action included therein appeared to be a drain pump case. She recommended they "reach out to the plaintiffs [*sic*] counsel in that case and advise them that we already have a settlement." Oliss Cert., Ex. 4. Upon

receiving no response, on October 20, 2017, Ms. Matloff emailed Mr. Oliss and the Court-appointed Mediator, seeking an update on proposed settlement document changes and again asked for a status on "the MDL in the exploding washer case which appears to have swept up a drain pump case." *Id.*, Ex. 5. The same day, Mr. Oliss responded via email and indicated he could speak with Ms. Matloff the following Monday. *Id.*, Exs. 6–7. The parties generally discussed issues of fact common to the MDL cases, Oliss Cert. ¶ 14, which SEA now argues are all distinguishable from the allegations in *Kennedy* and *Orenstein*.[2]

Over two weeks later, on November 6, 2017, the Court held another hearing to again inquire as to the parties' failure to produce settlement documents. ECF No. 49. Mr. Oliss told the Court that *Kennedy*/*Orenstein* were close to finalization, pending Mr. Nagel's submission of a revised claim form, which he agreed to send within 48 hours. *See* Nagel Cert., Ex. 3, Nov. 6, 2017, Hr'g Tr. 17:2–18:3. Noting the delay in drafting the settlement documents, the Court emphasized how the parties and Mediator had both informed the Court that the matters were settled in mediation. *Id.* at 16:11–16. At no time did the parties indicate a breakdown of the essential terms agreed upon in June.

To this Court's understanding, at the same time Messrs. Nagel and Oliss were hashing out the settlement papers and months after informing this Court they reached a settlement, the MDL parties—which included SEA's counsel, Mr. Oliss—entered mediation. On March 30, 2018, the MDL parties informed the MDL Court "they have agreed to the material terms of a global settlement and release of all relevant claims on a nationwide class basis as to all Defendants, subject to final review and approval of a written settlement by all the parties and their counsel." MDL Docket, ECF No. 75. A month later the MDL parties provided the MDL Court a joint notice as to finalizing the formal proposed settlement agreement. *Id.*, ECF No. 79.

While the MDL parties negotiated and reached a global settlement, Messrs. Nagel and Oliss advised this Court for the first time of their inability to settle *Kennedy* and *Orenstein*. ECF Nos. 52, 53. Counsels stated this despite the Court having previously received such assurances from the Mediator and counsel in its August and November 2017 hearings that the matters had been settled. *See* Nagel Cert., Ex.1, Aug. 15, 2017, Hr'g Tr. 3:20–5:1, 5:20–25, 7:6–10; Ex. 3, Nov. 6, 2017, Hr'g Tr. 26:15–16, 28:24–29:3, 30:10–16. Of concern to this Court and while the MDL progressed towards settlement, in an April 10, 2018, letter, Mr. Oliss told Mr. Nagel that "Samsung's incentives to continue attempting to engage with you regarding class settlement have changed." Oliss Cert., Ex. 22. Conspicuously, during the same time the MDL parties appeared closer to reaching a negotiated settlement, the talks between Plaintiffs' and SEA's counsels broke down. Counting on the MDL to sweep up *Kennedy* and *Orenstein*, SEA would have had little motivation to agree on written terms. Understandably so and considering the information given, Mr. Nagel informed the Court of the parties' failed mediation efforts and requested a status conference to move ahead in litigating *Kennedy* and *Orenstein*. *See* ECF No. 52.

---

[2] Mr. Oliss' vague description of this telephone call does not alter the Court's legal analysis or conclusion. *See infra* III.B.

In response, on April 23, 2018, Mr. Oliss filed a letter, informing the Court for the first time that SEA had "entered an agreement to settle other class-action litigation encompassing *the same washers and providing relief to all putative class members in the instant cases*." ECF No. 53 (emphasis added). In a status hearing the next day, the Court informed Messrs. Nagel and Oliss that it intended to issue an Order to Show Cause as to why the Court should not sanction the parties for misrepresentations made to this Court and for why SEA's counsel did not include *Kennedy* and *Orenstein* as potential MDL tag-along cases. Two days later, the Court issued an Order to Show Cause as to why *Kennedy* and *Orenstein* were not referred to the Panel months ago as potential tag-along cases. ECF No. 57.

During the May 2, 2018, Order to Show Cause ("Show Cause") hearing, Mr. Oliss told the Court he was aware of his obligation under the MDL Rules and offered two justifications for declining to refer *Kennedy* and *Orenstein* as potential tag-along cases. First, he asserted "the reason why these cases weren't included is [that] they did not involve the same allegations." *See* Nagel Cert., Ex. 7, May 2, 2018, Hr'g Tr. 33:8–10. Second, he noted the Mediator and the parties advised the Court back on June 13th that both cases had settled and explained that "you don't consolidate settled cases with unsettled cases for purposes of discovery and pretrial rulings." *Id.* at 33:13–23. Yet, as referenced in his April 23rd letter and during the Show Cause hearing, Mr. Oliss indicated the global MDL settlement releases may cover and bar the *Kennedy* and *Orenstein* alleged drain pump defect claims. In his April 30, 2018, letter and before the Court in the Show Cause hearing, Mr. Oliss admitted that in late March 2018, as part of the MDL Action, SEA agreed to include relief for washer drain pump failure allegations to include the same washing machine models at issue in *Kennedy* and *Orenstein*. *See* ECF No. 60; Oliss Cert. ¶ 38.

As the MDL settlement nears its conclusion and to avoid its potentially conflicting terms, Plaintiffs now ask this Court to enforce the settlement terms the parties agreed to as of June 13, 2017. *See* Pls.' Mot. for Settlement Enforcement 1–19, ECF No. 65-1. SEA opposes, arguing first the absence of a written agreement precludes enforcement because: (1) Third Circuit and New Jersey law bars Plaintiffs from enforcing an unmemorialized, alleged oral settlement reached during the parties' mediation; (2) the parties' post-mediation conduct shows no meeting of the minds on material terms; and (3) Plaintiffs' counsel cannot now accept terms from an email. Second, even if the parties had a valid, written settlement agreement, such agreement would be unenforceable because (1) Plaintiffs' counsel committed anticipatory breach and, in any case, both parties mutually abandoned the written agreement and (2) Plaintiffs' counsel cannot obtain Rule 23 class certification without injuring the rights of absent *Kennedy* and *Orenstein* putative class members. *See* SEA's Opp'n Br. 15–30, ECF No. 66.

## II. LEGAL STANDARD

"It is well settled that a federal court has the inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein." *Fox v. Consol. Rail Corp.*, 739 F.2d 929, 932 (3d Cir. 1984). "The stakes in summary enforcement of a

4

settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive the party of his right to be heard in the litigation." *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991). For this reason, the Third Circuit applies a summary judgment standard of review to settlement enforcement. *See id*. at 1032. A court, therefore, must treat the non-moving party's assertions as true, and will enforce a settlement only if the moving party is entitled to enforcement as a matter of law. *See id*. State law governs the substantive viability of settlement agreements. *See id.* at 1032–33. The party seeking to enforce a settlement bears the burden of proving the existence of the agreement in the first instance. *United States v. Lightman*, 988 F. Supp. 448, 458 (D.N.J. 1997) (citation omitted).

### III. DISCUSSION

The Court must determine whether, pursuant to New Jersey law, SEA and Plaintiffs reached an enforceable settlement. As an overarching principle, New Jersey courts view settlement agreements as normal contracts. *Nolan by Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990). As such, settlement occurs "where there is offer and acceptance and terms are sufficiently definite that the performance to be rendered by each party can be ascertained with reasonable certainty." *Lightman*, 988 F. Supp. at 458 (citing *Weichert Co. Realtors v. Ryan*, 608 A.2d 280 (N.J. 1992)). A settlement is enforceable so long as "the parties agree on essential terms, and manifest an intention to be bound by those terms." *Id.*

"[G]enerally speaking, oral agreements are enforceable even if they are not fixed in writing." *Pascarella v. Bruck*, 462 A.2d 186, 189 (N.J. Super. Ct. App. Div. 1983); *see Lahue v. Pio Costa*, 623 A.2d 775, 788 (N.J. Super. Ct. App. Div. 1993) ("Where the parties agree upon the essential terms of a settlement, so that the mechanics can be 'fleshed out' in a writing to be thereafter executed, the settlement will be enforced notwithstanding the fact the writing does not materialize.").[3] The principle by which oral settlements are enforced applies equally to class action matters. *See Joseph v. Edison Control Corp.,* No. A-3856-04T1, 2006 WL 2033666, at *3 (N.J. Super. Ct. App. Div. July 21, 2006).

#### A. Enforceability of the *Kennedy/Orenstein* Settlement

The record shows that an agreement on all essential terms was reached by mediation on or about June 13, 2017, a fact communicated to this Court directly by the Mediator, a

---

[3] SEA's brief cites *Beazer E., Inc. v. Mead Corp.*, 412 F.3d 429, 434 (3d Cir. 2005), for the proposition that parties to a "mediation session are not bound by anything short of a written settlement." SEA Opp'n Br. at 17–18. In fact, *Beazer E., Inc.* states that "parties to an *appellate* mediation session are not bound by anything short of a written settlement." 412 F.3d at 434 (emphasis added). The Third Circuit in *Beazer E., Inc.* made clear that its holding was specific to the appellate mediation context. *See id.* at 436 (" . . . appellate courts are not well-positioned to conduct fact-finding missions."). *Willingboro Mall, Ltd. v. 240/242 Franklin Ave., LLC*, 71 A.3d 888, 901 (N.J. 2013), also fails to support SEA's position as to the unenforceability of written settlements, because, *inter alia*, *Willingboro* concerns the rules governing *state* mediation proceedings, *see id.* at 71 A.3d at 888 (discussing exceptions to the mediation-communication privilege under N.J.S.A. 2A:23C-6), which having nothing to do with the instant proceedings.

5

former federal judge. Counsel for both parties repeatedly communicated to the Court in written letters and at formal hearings that *Kennedy* and *Orenstein* were settled. In a status hearing on August 15, 2017, SEA's counsel, Mr. Dosker, acknowledged that "[i]t was two months ago when the last material term was agreed to in principle . . ." Nagel Cert., Ex. 1, Aug. 15, 2017, Hr'g Tr. 3:11–12. Whatever was preventing final written documentation, Mr. Dosker assured the Court, was "not going to be something that sidelines the settlement, but, just for documentation." *Id.* at 4:22–23. On November 6, 2017, Mr. Nagel, counsel for Plaintiffs, affirmed that the parties "have a settlement. We have terms in Kennedy and Orenstein . . . ." Opposing counsel agreed: "Kennedy and Orenstein are settled." Nagel Cert., Ex. 3, Nov. 6, 2017, Hr'g Tr. 24:1-4.[4] Presuming these were not blatant misrepresentations, the above statements reiterate and affirm that settlement occurred in June of 2017. *See Lightman*, 988, F. Supp. at 461. ("Further evidence that [the defendant] manifested an intent to be bound . . . is [] the fact that [the defendant] permitted . . . this court to rely upon the impression that an agreement was at hand.").

Agreement on all essential terms was also reflected in the initial written drafts exchanged between the parties in the fall of 2017.[5] *Cf. Cerbo v. Ford of Englewood, Inc.*, No. BER-L-2871-03, 2005 WL 1252568, at *7 (N.J. Super. Ct. Law Div. May 16, 2005) (recognizing that oral statements may be useful "in order to provide understanding into the parties' intentions."). Drafts in August and September of 2017 confirmed that the parties agreed on the nature and amount of relief as well as attorneys' fees. *See* ECF No. 65-3.[6] *See Joseph*, 2006 WL 2033666, at *3 (enforcing a settlement based on oral agreements in mediation regarding relief and attorney fees). Any unresolved issues reflected in these exchanges—namely, procedures for establishing claimant eligibility—relate to "implementation" of the agreement rather than to its "essential terms," and therefore do not weigh against enforcing the settlement. *See McDonnell v. Engine Distribs.*, No. 03-

---

[4] SEA now states that Mr. Nagel's September 12th redline made "material changes" to its August 28th written draft. SEA Opp'n Br. at 5. Three conclusions can be drawn: (a) the "material changes" were rectified by November 6th, and SEA accurately represented to the Court that "Kennedy and Orenstein are settled"; (b) Mr. Nagel's changes were not "material," in which case SEA is now misrepresenting facts to the Court; or (c) the changes were indeed material, in which case SEA's statement that "Kennedy and Orenstein are settled" was untrue.

[5] The draft settlement papers from both parties claim protection from Federal Rule of Evidence 408, which renders inadmissible "conduct or a statement made during compromise negotiations." Fed. R. Evid. 408(a)(2). However, "Rule 408 does not bar the admission of settlement discussions that are relevant to deciding whether the parties settled the case." *Schatz-Bernstein v. Keystone Food Prod., Inc.*, No. CIV.08-3079-RMB-JS, 2009 WL 1044946, at *3 (D.N.J. Apr. 17, 2009).

[6] The relief contained in SEA's initial written draft, dated August 28, 2017, included the Three-Year Additional Warranty Protection; reimbursement of up to $150 per Claimant for repair costs; $25 per Claimant for Clean-Up Costs; $500 for each Claimant who "after first attempting to have their Washer Drain Pump repaired purchased a new washer," with a total cap amount of $50,000 on all such payments; and Attorney Fees of $600,000. ECF No. 61-1. Mr. Nagel's September 11, 2017, redlined version, emailed the next day to SEA's counsel, left each of these figures intact, including the Attorney Fees. ECF No. 65-3.

1999, 2007 WL 2814628, at *7–8 (D.N.J. Sept. 24, 2007). In short, through representations to this Court and to the Mediator, as well as through representations between the parties in written drafts and other communications, the parties continually "manifested an intention to be bound by [the] terms" of their June settlement, *Lightman*, 988 F. Supp. at 458 (citing *Weichert Co. Realtors v. Ryan*, 608 A.2d 280 (N.J. 1992)), such that only the "mechanics" remained to be 'fleshed out.' *Lahue*, 623 A.2d at 788.

The parties' statements in April of 2018 denying the existence of an agreement-in-principle do not change the fact that the parties had indeed agreed on all essential terms in June of 2017. In fact, New Jersey courts are leery of parties claiming that a verbal settlement has become 'un-settled' due to changes in circumstance or intransigent positions on matters of "implementation." *See Bistricer v. Bistricer*, 555 A.2d 45, 49 (N.J. Super. Ct. Ch. Div. 1987). To allow "such agreements [to be] subject to attack because they were not placed upon the record places in unnecessary jeopardy the very concept of settlement and the process by which settlement of litigation is ordinarily achieved." *Trian Grp., Ltd. P'ship v. Accident & Cas. Ins. Co. of Winterthur*, No. CIV. 98-1026 (GEB), 2006 WL 1784310, at *3 (D.N.J. June 26, 2006) (quoting *Pascarella*, 462 A.2d at 190). Hence, "[w]here a party to an agreement-in-principle suddenly changes its mind and refuses to execute the written contract without explanation, the court must enforce the agreement." *Id.* at *5 (quoting *Lightman*, 988 F. Supp. at 463). As one New Jersey Court put it:

> [T]he proposition that a case is not settled until the last "i" is dotted and the last "t" is crossed on a written settlement agreement carries the germ of much mischief. A party could, in bad faith, waste the time of the court and the other litigant in protracted settlement negotiations, and then, after a "framework" has been established, wiggle out of that framework by creating a flood of new issues and questions. Conceivably that could be the case here.

*Bistricer*, 555 A.2d at 49.

SEA argues that, even had the parties agreed on all essential terms, the settlement is unenforceable on several grounds. First, SEA argues that Plaintiffs committed an "anticipatory breach," when, on December 6, 2017, "Mr. Nagel bluntly told [Mr. Oliss] that . . . Mr. Nagel was not bound by [] any such terms because there was no term sheet." Oliss Cert. ¶ 26. Under New Jersey law, an anticipatory breach may be asserted by a "non-repudiating party" where the repudiating party makes "a definite and unconditional declaration . . . that he will not or cannot render the agreed upon performance." *Ray Angelini, Inc. v. Capitol Indem. Corp.*, No. A-2866-15T3, 2017 WL 1315034, at *7 (N.J. Super. Ct. App. Div. Apr. 7, 2017). SEA's argument is unsupported by the record. An email dated December 6, 2017, completely belies an "unconditional declaration" of Plaintiffs' intent not to perform. Oliss Cert., Ex. 18. If anything, the email demonstrates that both parties continued to seek performance under the settlement agreement and planned to

7

"flesh out" the final details with the Mediator. *See id.* In short, the doctrine of anticipatory breach does not apply because neither party repudiated the agreement.

Second, SEA argues that any enforceable agreement was "mutually abandoned in January and again in April 2018." SEA Opp'n Br. at 28. It directs the Court to its January 9, 2018, letter alleging that Plaintiff had attempted to "materially alter the settlement in principal that had been reached by the parties several months earlier with the assistance of Judge Orlofsky." ECF No. 51. Yet, "consent to abandon" was obviously not mutual, since the January 9th letter was a response to Plaintiffs' own letter earlier that day imploring the Court to order the Mediator to finalize the settlement. ECF No. 50. Clearly, Plaintiffs were not attempting to abandon the settlement, so abandonment was not "mutual." *See Cty. of Morris v. Fauver*, 707 A.2d 958, 965 (N.J. 1998) ("Abandonment of a contract take[s] place by the consent of both parties.") (quotations omitted). Lastly, the communications from April 2018, which SEA argues qualify as "mutual abandonment," are in fact statements that no settlement ever existed. *See* ECF No. 53 ("First, SEA agrees with Plaintiffs' Counsel that, notwithstanding Judge Orlofsky's considerable efforts, the mediation process has failed.").[7] But, as explained, settlement did occur, and the various exchanges after the November hearing are of no moment.

The Court will therefore enforce the settlement agreement reached by SEA and Plaintiffs in June 2017, pursuant to the Order accompanying this Opinion. The fact that no final, executed, written document has yet emerged is immaterial. For, "so long as the parties agree upon the essential terms of a settlement, leaving the details to be 'fleshed out' in a writing thereafter, courts will enforce settlement agreements notwithstanding the absence of a future writing." *Trian Grp.*, 2006 WL 1784310, at *3. *See Vandergrift v. Pennsauken Sch. Dist.*, No. CV 12-7646 (JS), 2017 WL 6566139, at *7 (D.N.J. Dec. 22, 2017) (citation omitted) ("Oral settlements are binding even when the parties contemplate the later execution of a formal document to memorialize their undertaking"). Counsel, not the Court, will expend whatever preternatural resources are required to memorialize these terms in a manner satisfactory to their clients. *See Lightman*, 988 F. Supp. at 461 (enforcing an "agreement-in-principle" but leaving the parties to formalize the terms of the agreement).

### B. The Multidistrict Litigation in the Western District of Oklahoma

Given the public and private resources committed to this matter since 2014, the Court will address recent revelations about the MDL ongoing in the Western District of Oklahoma since October 2017. *See* MDL Docket, Transfer Order. As the parties know, the MDL Rules demand that "[a]ny party or counsel in actions previously transferred under

---

[7] SEA's final argument is that the settlement is unenforceable because "it could not be certified under Rule 23 without injuring the absent class members in *Kennedy* and *Orenstein*." SEA Opp'n Br. at 29. This is not a Rule 23 proceeding, so the Court need not address this argument further.

Section 1407 [] promptly notify the Clerk of the Panel of any *potential* tag-along actions[8] in which that party is also named or in which that counsel appears." MDL Rule 7.1(a) (emphasis added). In this case, counsel for SEA knew that the putative class actions in *Kennedy* and *Orenstein* involve the same washing machine models as cases transferred to the MDL. In fact, the complaint in *Wagner v. Samsung Electronics America, Inc., et al.*, No. 2:16-03623 (E.D. Pa. June 30, 2016), included in the MDL, alleged a defect in the structural integrity of the drain pump housing which caused water to leak from SEA's washing machines. *See* Wagner Compl. ¶¶ 21, 51, 2:16-cv-03623, ECF No. 1. In other words, the allegations in *Wagner*, which the Panel determined in October 2017 fell within the MDL, included a defect in the same part of the same washing machine model alleged to be defective in *Kennedy* and *Orenstein*, in all three cases leading to leakage and some degree of water damage.[9]

To be clear, Mr. Oliss was intimately familiar with the MDL and its constituent matters: he was and is counsel for SEA in the MDL. Indeed, on June 9, 2017, four days before *Kennedy* and *Orenstein* settled, Mr. Oliss filed a detailed brief supporting SEA's motion to stay a separate case in this very District pending transfer to the Oklahoma MDL. *Moore, et al. v. Samsung Elecs. Am., Inc.*, 2:16-cv-4966 (filed 8/12/16), ECF No. 95. Yet, for reasons unknown, and to this Court's bewilderment, Mr. Oliss declined to take similar measures in this case, and SEA omitted *Kennedy* and *Orenstein* from its motion to transfer and consolidate the washing machine cases for pretrial proceedings in the MDL. 5:17-ml-2792, ECF No. 1. As a result, the Court remained entirely unaware of the MDL's existence until the status conference on April 24, 2018. Nevertheless, Mr. Oliss insists that *Kennedy* and *Orenstein* "involve different allegations than the 26 cases included in the MDL," which each "involve[] allegations that Samsung top-load washers have a propensity toward excessive vibration and explosion . . . ." Nagel Cert., Ex. 7, May 2, 2018, Hr'g Tr. 7:11–20. Mr. Oliss misses the point: the MDL Rules require parties to alert the Panel of potential tag-alongs, not make an independent assessment of whether a particular case—having not reached discovery—belongs for consideration before the Panel. Of greater note, Mr. Oliss has adamantly distinguished *Kennedy* and *Orenstein* from the MDL cases while simultaneously declaring "that SEA has entered an agreement to settle other class-action litigation encompassing the same washers and providing relief to all putative class members in [*Kennedy* and *Orenstein*]." ECF No. 53. *See* Nagel Cert., Ex. 7, May 2, 2018, Hr'g Tr. 45:20–21 (acknowledging that SEA's settlement in the MDL will seek "the broadest release" obtainable).

At the very least, SEA's counsel exhibited poor judgment and a misunderstanding of its obligations under MDL 7.1(a). Again, the Rules require notice of *potential* tag-alongs,

---

[8] "Tag-along action" refers to a civil action pending in a district court which involves common questions of fact with either (1) actions on a pending motion to transfer to create an MDL or (2) actions previously transferred to an existing MDL, and which the Panel would considering transferring under Section 1407. Rule 1.1 (h).

[9] That some of the alleged damage alleged in *Wagner* was more extreme than in *Kennedy* and *Orenstein* does not obscure the patent similarities among the three cases.

because the Panel—not counsel—enjoys exclusive authority to decide which cases belong to a multidistrict litigation, the purpose of which is to prevent waste and confusion caused by simultaneous overlapping litigation in different federal courts. The MDL Transfer Order explicitly chose to include *Wagner*'s allegation of a drain pump detachment. MDL Docket, Transfer Order. Indeed, for that reason, Plaintiffs' counsel wrote to Mr. Oliss twice in October of 2017, concerned that the MDL "appears to have swept up a drain pump case." Mr. Oliss provided no written response, nor did he alert the Panel. Instead, Mr. Oliss appropriated the Panel's authority unto himself, exercised that authority and remained silent while this Court continued to expend resources on a matter that Mr. Oliss likely anticipated would be eviscerated by a nationwide MDL settlement, after already having committed to a settlement in *Kennedy* and *Orenstein*.

Now informed of the MDL, the Court cannot avoid the specter of impropriety created by SEA's conduct in this litigation. To summarize, the parties verbally settled *Orenstein* and *Kennedy* on June 13, 2017. Ten days later, SEA and its co-defendants moved under Section 1407 to transfer and consolidate the MDL in Oklahoma, seeking to include *Wagner* (a drain pump case), while omitting reference to *Kennedy* or *Orenstein* (also drain pump cases). Meanwhile, between appearances before this Court, SEA mysteriously failed to present Plaintiffs with a draft agreement in the months following its June settlement, ultimately requiring the Court to formally Order that it produce a draft before September 1 2017. *See* ECF No. 46. On August 15, 2017, Mr. Dosker acknowledged that SEA had already spent 60 days drafting a written agreement. Nagel Cert., Ex. 1, Aug. 15, 2017, Hr'g Tr. 7:6–10. The Court made clear that further delay was unacceptable. *Id.* at 7:11–17 ("You know I can't accept this anymore . . . . [T]his is inordinately delayed and long and I have expressed this to Judge Orlofsky."). SEA continued to drag its feet throughout the fall months, and no written settlement materialized. Meanwhile, SEA moved (without notifying this Court) for transfer and consolidation of 24 actions in the Western District of Oklahoma on June 20, 2017.[10] MDL No. 2792, ECF No. 1.

Still awaiting final settlement documentation, and with no knowledge of the MDL, this Court was compelled to order yet another status conference on November 6, 2017, whereupon the parties again insisted that *Kennedy* and *Orenstein* had settled. Mr. Oliss explained that his firm was having "an incredibly difficult time in terms of the turn-around between here and Seoul Korea," Nagel Cert., Ex. 3, Nov. 6, 2017, Hr'g Tr. 8:18–2, as if his firm of over 1,500 lawyers (including several located in Seoul) and its client, a giant multinational conglomerate, were restricted to Eighteenth-century lines of communication.[11] As he offered these strange explanations, Mr. Oliss remained silent that

---

[10] While the Court acknowledges that Mr. Oliss was not counsel before the Panel, he was counsel for SEA in the MDL and was undeniably aware of the pending Section 1407 motion in June of 2017. *See Moore*, 2:16-cv-4966, ECF No. 95.

[11] htttps://www.squirepattonboggs.com/en/. The Court also notes that one of the firm's 47 offices is located in Seoul. https://www.squirepattonboggs.com/en/locations/seoul.

SEA was then negotiating a global settlement in the MDL, where "Philip M. Oliss" is listed as counsel for SEA on a status report dated November 9, 2017. MDL Docket, ECF No. 22.

In January 2018, activity on this docket ceased without explanation. On March 30, 2018, SEA and the MDL plaintiffs announced they had reached a settlement in principle. *Id.*, ECF No. 73. On April 10, 2018, Mr. Oliss sent Mr. Nagel and Judge Orlofsky an email ominously declaring that "Samsung's incentives to continue attempting to engage with [Plaintiffs] regarding class settlement have changed." *See* Oliss Cert., Ex. 23. On April 23, 2018, Mr. Oliss informed this Court that "Samsung has entered into an agreement to settle other class-action litigation encompassing the same washers and providing relief to all putative class members in the instant cases," such that an upcoming status conference before this Court would be—of all things—"premature." ECF No. 53. Low and behold, at the Court's May 2, 2018, Show Cause hearing, Mr. Oliss conceded that SEA would be seeking the "broadest release" possible in the MDL global settlement, leading this Court to reasonably conclude that the global settlement would encompass the instant actions. *See* Nagel Cert., Ex. 7, May 2, 2018, Hr'g Tr. 45:20–21, 54:25–55:5. In doing so, Mr. Oliss directly contradicted his own assertion that "Kennedy and Orenstein are not included in the MDL [] because they involve different allegations [than] the 26 cases that are included in the MDL." *Id.* at 7:11–12.

The Court will not at this time—but may in the future—address why SEA's counsel ignored the Federal Rules of Multidistrict Litigation and arguably took actions inconsistent with its client's interests, or why counsel chose not to inform the Court of the ongoing MDL until the latest moment possible, causing the expenditure of unnecessary public resources. For the reasons stated in the previous section, *Kennedy* and *Orenstein* were settled on June 13, 2017, and reaffirmed in August and November of 2017. That settlement is now enforced pursuant to the accompanying Order.

### IV.    CONCLUSION

For the reasons stated above, Plaintiffs' motion to enforce the settlement agreement is **GRANTED**. An appropriate Order follows.

/s/ William J. Martini
**WILLIAM J. MARTINI, U.S.D.J.**

**Date: May 21, 2018**